SNYDER'S DRUG STORES, INC., Appellee,

v.

NORTH DAKOTA STATE BOARD OF PHARMACY, Appellant.

Civ. No. 8834.

Supreme Court of North Dakota.

June 4, 1974.

Rehearing Denied June 27, 1974.

Wattam, Vogel, Vogel & Peterson, Fargo, and Richard C. Johnson, Hopkins, Minn., for appellee.

Conmy, Rosenberg & Lucas, Bismarck, for appellant.

ERICKSTAD, Chief Justice.

Famous last words!

 In its brief on appeal to this court prior to our decision in Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy, 202 N.W.2d 140 (N.D.1972), Snyder's, a subsidiary of Red Owl Stores, Inc., said:

> "*The U. S. Supreme Court will not reverse itself.* The argument of the State Board that the U. S. Supreme Court would now reverse the *Liggett Company* decision and uphold a statute restricting ownership to registered pharmacists, even though it had earlier found no real and substantial relationship between ownership of a drug store by pharmacists and the public health, is not persuasive."

The *Liggett Company* decision is none other than Liggett Co. v. Baldridge, 278 U.S. 105, 49 S.Ct. 57, 73 L.Ed. 204 (1928), which we concluded, as a court inferior to the United States Supreme Court on Federal constitutional issues, we were bound by, and upon which we based our decision in *Snyder's,* holding that Section 43–15–35(5), N.D.C.C., violated the Due Process

Clause of Section 1 of the Fourteenth Amendment to the United States Constitution.

Justice Douglas, speaking for a unanimous United States Supreme Court, in an opinion on a writ of certiorari, remanded *Snyder's* to us with these words:

> "The *Liggett* case, being a derelict in the stream of the law, is hereby overruled. We reverse and remand the judgment below and free the courts and agencies of North Dakota from what the State Supreme Court deemed to be the mandate of *Liggett*." North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 94 S.Ct. 407 at 414, 38 L.Ed.2d 379 (1973).

Pertinent to the trial court's conclusion on December 30, 1971, that Snyder's was entitled to a permit to operate a pharmacy in the Red Owl Family Center at Bismarck, North Dakota, are paragraphs IX, X, XI, and XII of the conclusions-of-law section of the trial court's findings of fact, conclusions of law, and order for judgment.

### "IX.

"The requirement that a majority of the stock of a corporate applicant for a permit to operate a pharmacy in the state of North Dakota be owned by registered pharmacists in good standing in North Dakota is not a reasonable requirement; it does not bear a definite relation to the public health, safety, and welfare and is not expedient and necessary for the protection of public health, public safety, public morals or public welfare. The requirement has no real, substantial relation to public objects which the government may legally accomplish, since it adds nothing to the legitimate regulation of drugs, pharmacists and pharmacies in the state of North Dakota, all of which are already closely and directly regulated by various federal and state statutes and agencies.

### "X.

"The exemption from the requirements of subsection 5 of Section 43–15–35 of the North Dakota Century Code of all those who held pharmacy permits on July 1, 1963, and all hospital pharmacies creates a classification which is not reasonably necessary to effect the purpose of the law. The effect of the exemption is to create a privileged class and to grant to that class an immunity which has not been granted on the same terms to all citizens of the state.

### "XI.

"Section 43–15–35(5) of the North Dakota Century Code is unconstitutional in that it violates Amendment 14, Section 1 of the United States Constitution, prohibiting a state from denying to any person within its jurisdiction the equal protection of the law and from depriving any person of his liberty or property without due process of law.

### "XII.

"Section 43–15–35(5) of the North Dakota Century Code is unconstitutional in that it violates both Section 11 of the North Dakota Constitution, which states that all laws of a general nature shall have uniform operation, and Section 20 of the North Dakota Constitution, which states that no citizen or class of citizens shall be granted privileges or immunities which shall not be granted to all citizens upon the same terms."

Snyder's contends that the trial judge's conclusion that Section 43–15–35(5), N.D. C.C., is unconstitutional is sustainable for the additional reasons that it violates Section 13 of the North Dakota Constitution, which provides that no persons may be deprived of property without due process of law, and that it violates Article I, Section 8, Clause 3, of the United States Constitution, which gives Congress the power to regulate commerce among the several States.

A summary of the argument of Snyder's, as stated in the introductory part of its brief, follows:

"The reversal by the Supreme Court of the United States adjudicates only the matters expressly ruled on and those matters alone become the law of the case in further proceedings. The only issue thus decided was that Section 43–15–35(5) of the North Dakota Century Code does not violate the due process clause of the 14th Amendment to the Federal Constitution. All other issues relating to that Constitution as well as the North Dakota Constitution are open for decision.

"The requirement of this law that a majority of the stock of a corporate applicant be owned by pharmacists registered in North Dakota is not a reasonable requirement and is not related to the public health, safety or welfare. It bears no real or substantial relation to a legitimate public purpose since it adds nothing to the regulation of drugs, pharmacies and pharmacists which are already closely controlled by federal and state statutes and regulations. What it does do is create a limited privileged class which receives preferential treatment.

"Sections 11 and 20 of the North Dakota Constitution were intended to prohibit this kind of legislation granting special privileges to small but politically powerful classes of people. Section 11 thus requires laws of a general nature to have a uniform impact:

" 'All laws of a general nature shall have a uniform operation.'

"Section 20 is essentially the converse of Section 11, for it prohibits the legislature from conferring special benefits or privileges upon small groups:

" 'No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.'

"Also applicable is Section 13 of the North Dakota Constitution which provides that no person may be derived of property without due process of law. While the United States Supreme Court has determined that Section 43–15–35(5) does not violate the due process clause of the Federal Constitution, that determination is not a bar to a contrary holding by this Court with respect to the due process clause of the North Dakota Constitution.

"Related to Sections 11 and 20 of the North Dakota Constitution is the equal protection clause of the Federal Constitution. A reasonableness standard has also been applied in this area, and at the very least the law in question must bear some rational relationship to a legitimate state purpose.

"Finally, Section 43–15–35(5) violates the commerce clause of the United States Constitution:

" 'The Congress shall have Power . . . To regulate Commerce . . . among the several States . . .' Art. I, Section 8, Clause 3,

"because it prevents free, unencumbered trade among the states and results in an unreasonable block to interstate commerce."

Let us analyze the argument of Snyder's in detail.

Part I of its argument is that Section 43–15–35(5) of the North Dakota Century Code violates Section 11 of the North Dakota Constitution providing that all laws of a general nature shall have uniform operation.

Snyder's asserts that contrary to Section 11, Section 43–15–35(5) is class legislation in that it creates an ownership classification for registered pharmacists denied to almost all others and that it exempts two

special classes from complying with the requirements of subsection (5): (a) all those who held permits on July 1, 1963, and (b) all hospital pharmacies, whether they held permits on July 1, 1963, or not. It asserts that since corporations in North Dakota can have perpetual existence [§ 10–19–04(1), N.D.C.C.], all corporations holding pharmacy permits on July 1, 1963, as well as corporations which might in the future operate hospital pharmacies, enjoy a special, and possibly perpetual economic privilege not available to individuals or corporations which may have the same stockholder makeup as the excluded corporations.

It argues that the law does not have a uniform impact, and that any justification for it must be rooted in the question of whether the classification is reasonable and necessary to accomplish the purpose of the enactment.

In support of its argument it relies most heavily upon two North Dakota cases, to-wit: Melland v. Johanneson, 160 N.W. 2d 107 (N.D.1968), and Beleal v. Northern P. Ry. Co., 15 N.D. 318, 108 N.W. 33 (1906).

In *Melland,* we struck down under Sections 11 and 20 of the State Constitution an initiated statute prohibiting legislators from doing more than $10,000 worth of business with the State. As Snyder's points out, we phrased the constitutional question presented in that case as follows:

"The question here resolves itself into whether the classifications are reasonably necessary to effect the purposes of the law, which is otherwise within the province of the legislature (or in the instant case within the province of the people) to enact." Melland v. Johanneson, *supra,* 160 N.W.2d 107 at 113, 114.

Snyder's contends that the announced purpose of the statute in the instant case was to prohibit physicians from owning pharmacies and that the exemptions were not reasonably necessary to accomplish the announced purpose, and that therefore the statute in its entirety must fall.

We should like to point out first of all that the evil of the statute in *Melland* was of a different nature than the evil attributed to the statute in the instant case, in that in *Melland* the statute went to the very foundation of democracy by arbitrarily excluding certain people from serving as lawmakers in the State Legislature; whereas in the instant case the result of the alleged evil is that certain persons are unable to engage in the business of pharmacy, a business likened in some respects to a profession, such as law or medicine.

In light of the quick and unanimous manner in which the United States Supreme Court found us to be in error in applying the due process principles enunciated by the majority of the Supreme Court in *Liggett*, it behooves us to give very careful consideration to what appears to be a "hands-off" philosophy now practiced and expounded by the United States Supreme Court in cases involving a clash between the police power of the State and private business rights.

■ In fact, not only has the United States Supreme Court reversed *Liggett*, but it has quoted with approval from Justice Holmes's dissent therein as follows:

"The Constitution does not make it a condition of preventive legislation that it should work a perfect cure. It is enough if the questioned act has a manifest tendency to cure or at least to make the evil less."

For the purposes of this case, we consider the objectives of Section 11 and Section 20 of the North Dakota Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be similar.

■ As we expressed in our recent decision of Johnson v. Hassett, Civil No. 8968, 217 N.W.2d 771 (N.D.1974), Federal courts examine State statutes only to determine if they comply with the United States constitutional mandates, and we as a State court examine them for that purpose

and also to determine if they comply with State constitutional mandates, which may be different from the Federal mandates. When we consider that what is at stake here is a clash between the desire of Snyder's to do business and the right of the public to be protected from abuse that could result from the improper dispensation of drugs, we have no difficulty in concluding that no compelling reason exists in this case for curtailing the authority of the Legislature in favor of the merchant, beyond that protection which the Supreme Court of the United States has said is due.

The contention of Snyder's that the announced purpose of the statute is to prevent doctors from taking over the pharmacies in the State is based upon a statement made by Senator Sinner in an appearance before the general affairs committee of the North Dakota House of Representatives on March 1, 1963, when the pertinent amendments to this statute were under consideration.

It is our view that we cannot accept Senator Sinner's statement of the objective of the amendment of Subsection 5 of Section 43–15–35, N.D.C.C., as encompassing all of the objectives of the amendment, or any of the objectives of the amendment, for that matter.

"§ 48.10. Statements at committee hearings.

"Although statements in the committee report as to the reason for or the nature and effect of the proposed law are freely used by the courts to determine the intent of the legislature, they have been more hesitant in resorting to similar statements made by committee members or other persons at the committee's hearings. In a few states, however, discussions before the committee have been resorted to for aid in construing statutes. But in at least one state it is definitely established that evidence of what occurred at a committee hearing is inadmissible as tending to show the legislature's purpose. Statements of members of the committee as to their understanding of a proposed bill or statements of interested parties are not admissible. Perhaps this aversion as well as the scarcity of cases in the state courts involving the admissibility of statements made at committee hearings, may be explained by the fact that in most states no official verbatim record is kept of most committee hearings."

\* \* \* \* \* \*

Sands, 2A Sutherland Statutory Construction, p. 209 (4th ed. 1973).

See also:

"48.16. Testimony of members of the legislature.

"As a corollary to the general rule against the use of statements of individual legislators made during debate on a bill, in construing a statute the courts refuse to consider testimony as to the intent of the legislature embodied therein by members of the legislature which enacted it. The courts evidently wish to avoid having to pass upon the credibility of legislators and ex-legislators.

"Although a subsequent legislature has power to change an act to achieve whatever prospective meaning or effect it desires, it has been held that the views of members of subsequent legislatures as to the meaning of acts passed by previous legislatures are not entitled to much weight."

Sands, 2A Sutherland Statutory Construction, p. 222 (4th ed. 1973).

As for *Beleal,* we find nothing in it especially significant to this case except the statement that corporations are protected by Sections 11 and 20, as well as natural persons. With that contention, we doubt that the Board disagrees. In *Beleal,* the supreme court of this State limited a statute imposing liability on railroads for injuries suffered by employees caused by fellow employees, to injuries suffered by employees from the negligence of a fellow

servant while engaged in some railroad employment which exposed the employees to those hazards which are peculiar to the use and operation of railroads. It did so, saying that any other construction would make the statute unconstitutional as establishing class legislation or as creating an improper classification.

In light of the age of the decision and the development of the law since it was enunciated, we place no great importance upon it.

The principle which we approved in State v. Gamble Skogmo, Inc., 144 N.W.2d 749 (N.D.1966), a case in which we sustained our Sunday Closing Laws against the attack that they violated the Equal Protection Clauses of Section 20 of the North Dakota Constitution and Section 1 of Article 14 of the Amendments to the United States Constitution, applies to sustain the Grandfather Clause of Section 43–15–35, N.D.C.C., which exempts certain corporations from Subdivision 5 thereof, by allowing those who had permits as of July 1, 1963, to continue in business.

■ The principle that we speak of is that taken from Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), and as abbreviated and approved in *Gamble Skogmo* reads:

> " 'Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. * * * Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * * The legislature may select one phase of one field and apply a remedy there, neglecting the others.' " State v. Gamble Skogmo, Inc., *supra*, 144 N.W.2d 749 at 760.

■■ It is our view that most corrective legislation necessitates a Grandfather Clause and that the existence of a Grandfather Clause within the statute, in itself,

should not warrant the death knell. See also Syllabus ¶ 4, State v. Gamble Skogmo, Inc., *supra*, 144 N.W.2d 749 at 752.

■ For other reasons, we likewise find the exemption from the provisions of Subsection 5 of Section 43–15–35, N.D.C. C., which allows hospital pharmacies furnishing service only to patients in the hospital to receive a permit, to be innocuous. It is our view that the Legislature could have very reasonably concluded that the necessities of the situation, namely the urgency for providing immediate and continuous pharmaceutical service to a limited clientele (hospital patients), justified the sacrifice of some control, which the Legislature deemed present in the requirement that the majority of the stock of a pharmacy be owned by a registered pharmacist in good standing who was actively and regularly employed in and responsible for the management, supervision, and operation of the pharmacy.

■ In one of our most recent decisions upholding a statute in face of the criticism that it unequally classified similar industries, we said:

> "It is also well established that a classification although discriminatory is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it. Rast v. Van Deman & Lewis, 240 U.S. 342, 36 S.Ct. 370, 60 L.Ed. 679 (1916); New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938). Furthermore, a court need not know the special reasons, motives, or policies of a State legislature in adopting a particular classification, so long as the policy is one within the power of the legislature to pursue, and so long as the classification bears a reasonable relation to those reasons, motives, or policies." Signal Oil and Gas Company v. Williams County, 206 N.W.2d 75 at 83 (N.D.1973).

In *Signal Oil* we sustained the validity of Section 57–02–04, Subsection 3, N.D.C. C., against the attack that it was unconstitutional because it classified for taxation as real property the machinery and equipment of oil and gas refineries and sugar-beet refineries, while it did not classify the machinery and equipment of other processors of raw materials, such as lignite coal or potatoes, in such a manner.

■ This opinion comports with our decision in *Gamble Skogmo*, affording the Legislature a broad discretion in classification.

In *Williamson*, the Supreme Court of the United States enunciated the principle which has been subsequently enunciated many times by it and which has been adopted by our court and which is applicable here.

"The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." Williamson v. Lee Optical of Oklahoma, *supra*, 75 S.Ct. 461 at 465.

In *Williamson*, the United States Supreme Court sustained an Oklahoma statute regulating opticians, optometrists, and ophthalmologists.

From what is said in the latter part of *Williamson* (p. 466), we gather that the Supreme Court of the United States believes that it is laudable for the Legislature to attempt to free professions to as great an extent as possible from all taints of commercialism. The requirements of Subsection 5 of Section 43–15–35, N.D.C. C., may have been designed to do just that.

We conclude that Section 43–15–35(5), N.D.C.C., does not violate Section 11 of our State Constitution.

In part II of the argument of Snyder's, it asserts that Section 43–15–35(5), N.D.C. C., violates Section 20 of the North Dakota Constitution providing that no citizen or class of citizens shall be granted privileges or immunities which shall not be granted to all citizens upon the same terms.

In the part of its brief devoted to this argument, Snyder's refers us to Melland v. Johanneson, *supra*, 160 N.W.2d 107 (N.D. 1968), and Estate of Jensen, 162 N.W.2d 861, 877 (N.D.1968).

Since we have previously discussed *Melland,* we will not again comment on it.

*Jensen* involved that type of legislation which we deemed "inherently suspect". Believing that we were applying the principles enunciated in Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), rehearing denied 393 U.S. 898, 89 S.Ct. 65, 21 L.Ed.2d 185 (1968), we said:

" * * * as no action, conduct, or demeanor of the illegitimate children in the instant case is relevant to their status of illegitimacy, we conclude that the classification for purposes of inheritance contained in § 56–01–05, which is based on such a status and which results in illegitimate children being disinherited while their legitimate brothers and sisters inherit, is unreasonable.

"Accordingly, considering § 56–01–05 in light of § 56–01–06, and in light of the repeal in 1917 of C.L.1913, § 5745, the predecessor of § 56–01–05, and its incredible return to life, we have no hesitancy in holding that § 56–01–05 is unconstitutional as an invidious discrimination against illegitimate children in violation of § 1 of the fourteenth amendment to the United States Constitution and § 20 of the North Dakota Constitution. This statute, which punishes innocent children for their parents' transgressions, has no place in our system of government, which has as one of its basic tenets equal protection for all." In re Estate of Jensen, *supra*, 162 N.W.2d 861 at 878.

In light of the incredible manner in which a harsh statute of the era of the common law which was once repealed was

given new life by the code revisers, and the nature of the classification involved in that statute as compared to the nature of the classification involved in the statute in the instant case, we believe that *Jensen* and this case are not comparable.

In any case, the United States Supreme Court in an opinion written by Justice Black, considering a statute of Louisiana similar to the statute involved in *Jensen,* held the statute to be constitutional against the claim that it was in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. It did so in these words:

> "In short, we conclude that in the circumstances presented in this case, there is nothing in the vague generalities of the Equal Protection and Due Process Clauses which empowers this Court to nullify the deliberate choices of the elected representatives of the people of Louisiana." Labine v. Vincent, 401 U.S. 536, 91 S.Ct. 1017 at 1021, 28 L.Ed.2d 288 (1971), rehearing denied 402 U.S. 990, 91 S.Ct. 1672, 29 L.Ed.2d 156 (1971).

It is interesting to note that Section 11 of Article I of the California Constitution is similar to Section 11 of Article I of our Constitution, and that Section 21 of Article I of the California Constitution is similar to that of Section 20 of our Constitution. Commenting relative to Sections 11 and 21 of Article I of the California State Constitution, the supreme court of California said:

> "These provisions of our state Constitution have been generally thought in California to be substantially the equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution." Department of Mental Hygiene v. Kirchner, 62 Cal.2d 586, 43 Cal.Rptr. 329, 330, 400 P.2d 321 at 322 (1965).

■ Notwithstanding that we have in the recent case of Johnson v. Hassett, Civil No. 8968, 217 N.W.2d 771 (N.D.1974), recognized that we may give a meaning to Sections 11 and 20 of our State Constitution relating to Equal Protection, and a meaning to Section 13 of our State Constitution as it relates to Due Process of Law different from that which the United States Supreme Court may give to the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, we conclude that in this case there is no compelling reason to do so.

We conclude that Section 43–15–35(5) does not violate Section 20 of the North Dakota Constitution.

In part III of its brief, Snyder's asserts that Section 43–15–35(5), N.D.C.C., violates Section 13 of the North Dakota Constitution providing that no persons shall be deprived of property without due process of law.

In support of this contention, Snyder's emphasizes that there is a distinction in North Dakota between the permit required to operate a pharmacy and the license to practice pharmacy. It points out that the present lawsuit involves only a permit to operate a pharmacy.

It asserts that because there are so many sections of the North Dakota Century Code and provisions of the Food, Drug & Cosmetic Act of the Federal law, with accompanying regulations, which protect the public health, safety, and welfare, Section 43–15–35(5) is unnecessary. In fact, Snyder's asserts that Subsection 5 has nothing whatever to do with public health, safety, and morals.

■ Notwithstanding that we came to this conclusion in Snyder's Drug Stores, Inc. v. North Dakota State Board of Pharmacy, 202 N.W.2d 140 (N.D.1972), applying the principle stated in *Liggett,* having now been released from the mandate of *Liggett,* we come to the conclusion that Section 13 of our State Constitution does not compel the result advocated by Snyder's.

■ We do not think it proper to conclude that merely because the Legislature has made certain efforts to control drugs in addition to those contained in Section 43–15–35(5), or because the Federal Government through its laws and its regulations has also attempted to control drugs, that the method of control contained in Section 43–15–35(5) should be disapproved of.

■ In response to this part of the brief of Snyder's, the Board asserts that the ownership requirement of Section 43–15–35(5) does have a substantial relation to the public interest, health, and welfare, and therefore does not violate the Due Process Clause of Section 13 of the North Dakota Constitution. Since reasons for the ownership requirement need only be conceived and not proved, the Board in supplying seven possible reasons for the requirement asserts that the test of reasonableness has been met.

Briefly, the seven possible reasons asserted for the ownership requirements follow:

(1) The professional and ethical standards of pharmacy demand the pharmacist's concern for the quantity and quality of stock and equipment. A drug which has deteriorated because of improper storage facilities can be a detriment to public health. A drug not in stock poses a threat to the individual who needs it now. Decisions made in conjunction with the quantity and quality of stock and equipment by nonregistered-pharmacist owners could be detrimental to the public health and welfare.

(2) Supervision of hired pharmacists by registered-pharmacist owners would be in the best interests of public health and safety.

(3) Responsibility for improper action could be more readily pinpointed when supervision is in registered-pharmacist owners.

(4) The dignity of a profession and the morale and proficiency of those licensed to engage therein is enhanced by prohibiting the practitioner from subordinating himself to the direction of untrained supervisors.

(5) If control and management is vested in laymen unacquainted with pharmaceutical service, who are untrained and unlicensed, the risk is that social accountability will be subordinated to the profit motive.

(6) The term "pharmacy" was intended to identify a particular type of establishment within which a health profession is practiced, and thus was intended to be more than a mere means of making a profit. He who holds the purse strings controls the policy.

(7) Doctor-owned pharmacies with built-in conflict-of-interest problems could be restricted.

Without attempting to weigh these alleged justifications for the ownership requirements of Section 43–15–35(5), we note that the Legislature may have conceived of some of these reasons, and that is a sufficient basis for sustaining those requirements. Signal Oil & Gas Co. v. Williams County, 206 N.W.2d 75 at 83 (N.D.1973).

In part IV of its brief, Snyder's contends that Section 43–15–35(5), N.D.C.C., violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

It asserts that the scope of permissible regulation of the retail drug business was defined in Milligan v. Board of Registration in Pharmacy, 348 Mass. 491, 204 N.E. 2d 504 at 510, 511 (1965):

"Thus, the Legislature may regulate pharmacists and drug stores in a manner reasonably designed and appropriate to insure competence and diligence on the part of pharmacists, cleanliness of premises, the purity and safety of products sold, the prevention of the unlawful

sale of narcotics, and similar health matters.

"When regulation is attempted beyond such matters more difficult questions of constitutional validity may arise concerning whether particular statutes, regulations, or policies, or their application in particular circumstances, bear a reasonable relation to significant aspects of the public interest. Particularly is this so in respect of occupations other than those (for example, insurance, banking, public utility operation, and the traditional professions) most obviously appropriately subject to public regulation. If such other occupations are to be regulated in a manner which materially restricts qualified persons from engaging in them, it is of special importance that there be apparent the public grounds which constitutionally justify the interference with such persons' freedom of employment and business activity."

■ In light of what we have heretofore said relative to Section 20 of our State Constitution relating to Equal Protection, and more particularly in light of what we have heretofore said relative to the hands-off policy of the United States Supreme Court relative to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, it is our view that we cannot say that the ownership requirements of Section 43–15–35(5) of the North Dakota Century Code bear no reasonable relation to significant aspects of the public interest.

■ Snyder's would have us apply the test expressed by Justice Douglas in his concurring opinion in United States Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821 at 2829, 37 L.Ed.2d 782 at 791 (1973), where he said the test of Equal Protection "is whether the legislative line that is drawn bears 'some rational relationship to a legitimate' governmental purpose. * * *"

Even applying Justice Douglas's test, we cannot say that there is no rational relationship to a legitimate governmental purpose in the ownership requirements of Section 43–15–35(5), N.D.C.C.

In part V of the brief of Snyder's, it asserts that Section 43–15–35(5), N.D.C.C., violates the Commerce Clause, Article I, Section 8, Clause 3, of the United States Constitution.

Section 8 of Article I of the Constitution confers the power to regulate commerce upon Congress.

Snyder's asserts that the effect of Subsection 5 of Section 43–15–35, N.D.C.C., is to exclude from North Dakota all drugstores and pharmacies owned by non-pharmacist corporations, and that this exclusion violates the Commerce Clause.

It relies chiefly upon two cases, Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), and Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), in support of its contention that the statute should be declared unconstitutional.

■ It is our view that those cases are distinguishable upon their facts, in that the prohibitions of the statutes involved in those cases created economic barriers without justification, whereas interests of public health and welfare justify the statutory provision of Section 43–15–35(5), N.D.C.C.

For the reasons stated in this opinion, Section 43–15–35(5), N.D.C.C., is found not to be in violation of Sections 11, 13, or 20 of the North Dakota Constitution, or of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution or of the Commerce Clause of Section 8 of Article I of the United States Constitution.

■ Keeping in mind the principle expressed in Syllabus ¶ 2 of State v. Gamble

Skogmo, 144 N.W.2d 749 at 752 (N.D. 1966),

"State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality"

and for the other reasons stated in this opinion, the judgment of the trial court is reversed.

VOGEL, TEIGEN, PAULSON and KNUDSON, JJ., concur.